# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 1, 2009 Session

## STATE OF TENNESSEE v. DARRYL KEITH ROBINSON

**Appeal from the Criminal Court for Shelby County**
**No. 05-05746      Joseph B. Dailey, Judge**

---

**No. W2008-02069-CCA-R3-CD  - Filed February 3, 2010**

---

The Defendant, Darryl Keith Robinson, was indicted for one count of felony murder and one count of premeditated first degree murder. See Tenn. Code Ann. § 39-13-202. He was also charged with one count of theft of property valued at greater than $10,000 but less than $60,000, a Class C felony. See Tenn. Code Ann. § 39-14-105(4). Following a jury trial, he was found guilty as charged of theft, and convicted of one count of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210(c). He was sentenced as a Range I, standard offender to consecutive sentences of twenty-five years for second degree murder and six years for theft of property, for a total effective sentence of thirty-one years in the Department of Correction. In this direct appeal, he contends that:(1) the trial court erred by excluding evidence that the victim filed for orders of protection against another individual; (2) the trial court erred by allowing testimony that the Defendant had a criminal history; (3) the trial court erred by allowing testimony regarding a conversation between the victim and the Defendant; (4) the State presented evidence insufficient to convict him of either second degree murder or theft of property valued at greater than $10,000 but less than $60,000; and (5) the trial court erred in setting the length of the Defendant's sentence. After our review, we affirm the Defendant's conviction for second degree murder. We vacate the twenty-five year sentence imposed for the second degree murder conviction. We modify the conviction for Class C felony theft to a conviction for Class A misdemeanor theft. We remand this case to the trial court for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, (on appeal), and Anthony Helm, Memphis, Tennessee, (at trial) for the appellant, Darryl Keith Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Alanda Dwyer and Amy Weirich, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

At trial, the State presented the testimony of Tiffiney Oliver, a friend of the victim, Giovanna Egan. Ms. Oliver testified that she began working as a commercial resale representative at ADT Security Services in Memphis in February 2004. She met and befriended the victim, who held the same job. The two remained friends until the time of the victim's death in October 2004.

Ms. Oliver testified that the victim had been romantically involved with the Defendant when Ms. Oliver met her; the victim introduced her to the Defendant in February 2004. Until September 2004, the victim and the Defendant had lived together; their romantic relationship ended during that month, however, at which time the victim moved into a house of her own. Ms. Oliver never saw the Defendant at that house.

At some time in September, after the romantic relationship between the victim and the Defendant had ended, Ms. Oliver witnessed the victim receive a phone call from the Defendant. Both the victim and Ms. Oliver were at the victim's desk at ADT. The victim's cell phone rang; when she answered it, Ms. Oliver heard the Defendant's voice. He spoke very loudly and angrily. She heard him say, "Why did you take the fucking car?" He also said "there would be hell to pay if [the victim] didn't get the fucking car back." The Defendant continued to yell for three or four minutes; Ms. Oliver then took the phone away from the victim and hung up because coworkers were beginning to stare at them. The victim never raised her voice to the Defendant during the phone call.

The victim explained to Ms. Oliver that she and the Defendant owned a Toyota Tercel that she had purchased from a family member with the understanding that the Defendant would fix it. The victim had taken the car that morning for reasons that were not made clear at trial.

Soon after the end of the phone call, Ms. Oliver and the victim left ADT to go to a barber shop. They arrived about ten minutes after the call concluded. As they entered the barber shop, the Defendant again called the victim's cell; Ms. Oliver saw his name appear on the cell's screen, and she could again hear him during the subsequent conversation. The Defendant again yelled at the victim about the Tercel. The victim yelled back. After a few moments, Ms. Oliver heard the Defendant say, "If you don't get the fucking car back, I'm going to kill you. That's my [fucking] car, and you had no right messing with my car." Ms. Oliver said that the Defendant got the car back a few days later, after the victim arranged to have it towed to a body shop; Ms. Oliver heard the Defendant thank her for returning the car.

On Saturday, October 16, 2004, Ms. Oliver hosted a dinner party at her house. She invited the victim, who said she planned to attend. The victim also said she would bring some food. Ms. Oliver asked the victim to come over at about 7:00 p.m., but she never arrived. Ms. Oliver called the victim a few times between 7:00 and 8:00 p.m., but received no answer. She began to get worried and called Daniel Moore, a friend of hers and the victim's. She asked Mr. Moore, who lived close to the victim, to drive by the victim's house and see if she was there.

Mr. Moore, a former police officer, testified that he met the victim in October 1997, when he had hired her to work at Harrah's Casino. He also confirmed that he and the victim had been romantically involved for a few months between 2000 and 2001. Their relationship ended largely because Mr. Moore refused to leave his wife; he and the victim had remained friends, however. Mr. Moore received Ms. Oliver's call at about 8:00 p.m. on October 16, 2004, at which time she asked him to drive by the victim's house.

Mr. Moore noted at trial that he had spoken to the victim that morning, as well as the night before. That morning, she had told Mr. Moore she was alone. Because Mr. Moore lived about two miles from the victim, he was able to reach her house at about 8:15 p.m. He noticed that her garage door was down and that lights were on in the house, including the one in her bedroom. Mr. Moore thought this was strange because the victim was a very private person. He had visited the victim's new house once and believed that she lived there alone.

Mr. Moore assumed that the victim had company and would not be attending Ms. Oliver's party. He called Ms. Oliver and told her what he had seen. He then drove to Ms. Oliver's house and confirmed that the victim's vehicle was not there. Although Ms. Oliver had also invited him to her party, he decided to go home.

On cross-examination, Mr. Moore noted that he had given the victim "several thousand dollars" between 2000 and 2002 to pay bills and various expenses. He did not expect to be paid back, and did not give the victim money in order to help purchase her new

house.  He generally saw the victim about once a month, usually meeting her for lunch.  He also said that he was not jealous of the victim, but that he was worried about her welfare.

The victim's son, Christopher Bidal, testified that he last saw the victim on October 14, 2004, when she accompanied him to a car dealership to help him buy a 2004 Mercury Sable.  Mr. Bidal confirmed that the victim lived alone in her new house and that she had lived there for about a month at the time of her death.  She had previously lived with the Defendant in a different house.  The victim owned a 2002 Ford Escape.

On the morning of October 17, 2004, Mr. Bidal received a call from Ms. Oliver, who asked him to go to the victim's residence and check on her.  Ms. Oliver also said that the victim had not been answering her phone.  Mr. Bidal, who had one of the victim's garage door openers in his possession, went to the victim's house sometime between 11:00 a.m and noon.  Upon opening the victim's garage, he saw that her car was missing.  He also saw a smeared trail of blood between the middle of the garage and a door leading into the house.  Mr. Bidal went outside, called 911, and waited for police to arrive.

Officer Terry Thompson of the Memphis Police Department ("MPD") was one of the uniformed patrol officers to be dispatched to the victim's house after Mr. Bidal's 911 call.  Upon arrival, he entered the garage, saw blood on the garage floor, and entered the house through the door from which the blood trail originated.  Officer Thompson saw more blood inside the hallway.  He entered the house and quickly checked for any occupants; finding none, he left and secured the house.  He noted that he saw no signs of forced entry, but that the back door was slightly open.

Mr. Bidal called Ms. Oliver and told her about his findings at the victim's house; she then called Mr. Moore and informed him.  Both came to the crime scene.  Mr. Moore testified at trial that  he spoke to police and agreed to provide them with his contact information and a DNA sample.  He did so because he wanted to rule himself out as a suspect. Mr. Moore offered no further details at trial because the trial court had, at a pre-trial hearing, granted the State's request to exclude as irrelevant the fact that the victim had twice filed petitions for orders of protection against Mr. Moore in June 2003.

Cerbinia Braswell, at the time a forensic scientist with the Shelby County Medical Examiner, was called to the victim's house on October 17 to assist law enforcement by conducting a bloodstain pattern analysis.  At the time of trial, however, she worked as a Special Agent forensic scientist with the Tennessee Bureau of Investigation ("TBI").  Her examination of the victim's house revealed blood stains in the garage and in the hallway connecting the inside of the house to the garage.  She also found a small amount of blood in the kitchen at the end of the connecting hall.  She found no blood in the victim's bedroom.

Agent Braswell noted that bloodstains appeared on the walls of the connecting hallway, as well as on the doors to the bedroom, attic, and garage lining the hallway. All three doors were closed. The blood "flight pattern" in the hallway was consistent with a bleeding victim bumping into the walls and doorframes while moving down the hall. Agent Braswell noted that the blood on the walls and doors was thicker than that on the floor, indicating that someone had attempted to clean up the blood on the floor. The blood on the floor also contained a shoe print. The blood in the garage formed a large smear reaching from the door into the house to the center of the garage. Agent Braswell said that the smear was consistent with a horizontal human body being pulled across the floor. She also said that she noticed, upon inspecting the garage, that a purse was hanging from the handle of the door into the house.

Officer Daniel Jacobs, a member of the MPD crime scene unit, introduced numerous photographs of the victim's house and noted certain items of evidence collected from the scene, including: an answering machine found in the bedroom; an empty can of Diet Pepsi found on a counter in the garage; an ashtray and cigarette butt found in the kitchen; and a bag containing three DVDs and a receipt. Officer Jacobs also collected four blood samples: one from the wall of the hallway, one from the attic door in the hallway, one from the hallway floor, and a control sample. Finally, he unhinged the door from the hallway into the garage and collected it as evidence.

After establishing the events that led to his 911 call, Mr. Bidal identified a number of photographs of the victim's home. He noted that crime scene photos of the hallway showed that a carpet runner usually present near the door to the garage was missing. Drawers in the victim's bedroom had been pulled out and clothing was strewn about the floor; Mr. Bidal said that the victim kept the bedroom very clean. He also testified that a silver-handled knife was missing from one of the kitchen drawers.

Sergeant T.J. Helldorfer of the MPD's homicide division also investigated the victim's house on October 17. He testified that he arrived about 3:20 p.m. He opined that the search of the victim's bedroom looked "staged," as there was no indication anything had been taken from the house. He acknowledged on cross-examination, however, that something could have been stolen without his knowledge. He also found no evidence of forced entry. Sergeant Helldorfer radioed a description of the victim's missing car to the Memphis police force and proceeded to interview other residents of the victim's neighborhood.

Shortly thereafter, Sgt. Helldorfer received information that the Defendant might be a suspect. He was told to check the house at which both the victim and Defendant used to live; he did not find the Defendant there, however. He also spoke to the Defendant's family,

who were cooperative and concerned that the missing Defendant might also have been a victim. He told the Defendant's mother to have the Defendant make contact with the police if she saw him. To Sgt. Helldorfer's knowledge, the Defendant never did so. At some point, Sgt. Helldorfer collected a DNA sample from the Defendant's mother because he could not locate the Defendant to obtain one from him.[1] On December 1, 2004, Sgt. Helldorfer was told that the Defendant's mother had spoken to the Defendant. On January 5, 2005, he returned to the Defendant's mother's house; she had moved, however, and he was unable to locate her. Sergeant Helldorfer believed that the Defendant, when he eventually came into police custody about two weeks after being indicted, claimed to have been hiding from the "real" killer. Sergeant Helldorfer also stated that, during the course of the investigation, he noted that the victim's cell phone was being used. After tracking it, he discovered that it had been found in the grass median on Germantown Road by a member of a work crew from a nearby penal farm.

Gwen Watts, a Memphis resident, testified that she noticed a purse on the sidewalk near her house as she went to the grocery store at about 8:30 a.m. on October 17. When she returned, she saw that the purse was still on the sidewalk. After looking through it, she found a checkbook bearing the victim's name; Ms. Watts deduced that the victim worked for ADT when she saw the company recorded in the deposit register. She called ADT, but found that the company office was closed on Sundays. She then called the phone company in an effort to get the victim's number; a phone company employee could not give Ms. Watts the unlisted number, but promised to call the victim and leave a message that her purse had been found. The police, apparently having listened to the message on the victim's answering machine, contacted Ms. Watts sometime between 2:00 and 4:00 p.m. that day and recovered the purse. Witnesses identified this purse as being different from the one found on the handle of the door connecting the victim's house to her garage.

Terri Sails, another Memphis resident, testified that she heard a car door slam outside her house at about 4:00 a.m. on October 17. After waking up between 8:00 and 9:00 a.m., she saw a "truck" she did not recognize parked on the road by the side of her residence. That evening, concerned that the truck had been parked unattended for so long, she approached the truck and looked inside the passenger compartment, seeing a black briefcase on the floor near the driver's seat. She did not look in the back of the truck  The vehicle was eventually determined to be the victim's 2002 Ford Escape.

Officer Marlon Wright of the MPD crime scene unit testified that he dropped his son off at football practice between 5:30 and 6:00 p.m. on October 17. As he drove home, he

---

[1] Testimony established that the Defendant's mother's DNA could be used to determine whether the Defendant's DNA was present on any evidence.

saw the victim's Escape parked nearby. As he drove by the vehicle, he confirmed that it matched the make, model, and tag number that the homicide division had sent out over the radio as a result of their investigation at the victim's house. Officer Wright contacted his supervisor, who arrived, with homicide detectives, to assist at the scene. Upon opening the back of the vehicle, they found the victim's face-down body wrapped in a carpet runner. Officer Wright had the vehicle loaded onto a flat-bed wrecker and taken to one of the MPD's secured vehicle bays for further examination.

Charlton McCollum testified that he covered the victim's disappearance in his capacity as a photojournalist for Memphis' FOX 13 News. He was in the area when Officer Wright and other police personnel recovered the victim's vehicle on October 17. After Mr. McCollum finished a particular live shot, an area resident drove by and told him police were inspecting a bag of clothes on a perpendicular street about a block away. On the following Tuesday, October 19, 2004, Mr. McCollum returned to the area and found a large black trash bag full of clothes in the indicated area, near a number of other black trash bags full of leaves and pine cones. Testimony established that the bag and the victim's car were both located near Parkway Village Apartments, the Defendant's neighborhood at the time.

On the following Friday, October 22, 2004, when it was still believed that the Defendant may also have been a victim, Mr. McCollum accompanied the Defendant's family and a search party as they combed the area around a nearby creek. Mr. McCollum told the Defendant's brother, Danny, about the trash bag. He then took Danny to it. The bag was slightly open; Danny looked around inside it using a stick, and said that some of the bag's contents looked like the Defendant's. Mr. McCollum noticed a blood-like substance on some of the contents of the bag, but assumed it was transmission fluid. Mr. McCollum also noticed a mop lying on the ground near the bag. The police were informed about the bag and mop and collected them as evidence. After looking at a police photograph of the area, Mr. Bidal, the victim's son, testified that this mop appeared to be the one that was missing from its usual storage location in the victim's garage.

Patricia Turnmire of the MPD crime scene unit recovered this bag on October 22. A call from a nearby resident led her to believe that the bag had not been present in the area the night before. She also searched the area around the bag, finding a customer comment card bearing the victim's signature lying in the street nearby. The bag itself contained numerous items, all of which Ms. Turnmire documented, including: a white bath towel; a number of items of men's clothing; a Game Boy video game system; deodorant; three belts; five neckties; a blank cassette tape; an empty cologne bottle; two calculators; a wrist stud; a "Darryl Robinson Home Improvement" business card bearing the Defendant's phone number; a "Robinson Lawn Care Service" business card bearing the Defendant's name, phone number, and address; a piece of a broken golf club; a key to a Toyota automobile; a

cigarette lighter; a disposable razor container; two Wal-Mart plastic bags; one Burlington Coat Factory plastic bag; a broken silver watch; a pair of flip-flops; an ADT Club Excellence gym bag; and one latex glove. A second latex glove was found at the bottom of a neighbor's empty garbage can. Ms. Turnmire testified that the white bath towel was "wet" and "bloody"; a few of the men's clothing items were also wet, and some had mud on them. One of the shirts also had blood stains on it. The garbage bag itself was found to contain a palm print; that portion of the bag was collected for testing.

In an effort to find fingerprints, Francis Carpenter of the MPD chemically processed items recovered from the black garbage bag and from the victim's house and car, including an empty chocolate box found on the car's front passenger seat; a booklet from the back seat; the empty Diet Pepsi can from the victim's kitchen; a Cellular South bill; the piece of the black garbage bag; one of the latex gloves; the Burlington Coat Factory and Wal-Mart bags; and the door into the victim's garage. He found ridge detail on the chocolate box, the Diet Pepsi can, and the piece of the black garbage bag. He could not recover any ridge detail from the inside of the latex glove he examined, but testified that fingerprints were very difficult to recover from latex.

Janice Carter, an employee of the Records and Identification section of the Shelby County Sheriff's Office, testified that her office maintained the fingerprint records of anyone who had ever been arrested in the county. She affirmed that she had the Defendant's fingerprints on file, although she did not have his palm print; his palm print would have been taken and then sent to the latent prints department.

James Hill, a latent fingerprint examiner with the MPD, testified that he received the latent fingerprint lift cards produced by Mr. Carpenter from the items on which he had found ridge detail. Mr. Hill was asked to compare the prints on those cards with the prints on file for the Defendant and the victim. He found that the fingerprints taken from the chocolate box and the Diet Pepsi can matched the victim. The palm print on the black garbage bag, however, matched that of the Defendant.

Special Agent Brad Everett of the TBI serology and DNA unit conducted DNA tests on certain items brought to him on November 11, 2004, by Sgt. Helldorfer. He identified only the victim's DNA on certain fingernail scrapings taken from her body. He also determined that the bath towel found in the black garbage bag contained the victim's blood. Agent Everett could not recover a sufficient DNA sample from the bloody shirt or flip-flops found in the black garbage bag. He also could not recover a sufficient sample from the victim's mop.

Doctor Karen Chancellor, an employee of the Shelby County Medical Examiner, performed the victim's autopsy on October 19. She noted that the victim's clothing was stained with a significant amount of blood. Doctor Chancellor introduced a chart of the victim's twenty-five stab wounds; the victim suffered most of the wounds to her chest and her back, but suffered a few to her left arm. The wounds were inflicted by a single-edged, non-serrated knife, and damaged the victim's breastbone, ribs, lungs, heart, and liver. The victim had no alcohol in her blood, but had taken some Benadryl. Doctor Chancellor concluded that her death had been caused by multiple stab wounds and that death occurred on October 16 or 17, the latter being more likely.

The Defendant chose not to testify but called witnesses in his defense. Ruth Ann Cherry, a global support agent for Federal Express, testified that, in October 2004, she lived near the corner at which the black garbage bag was found. On "a morning in October" which was either a Wednesday or a Thursday, she recalled waking up at her usual time of 4:00 a.m. She heard a knock on her front door shortly thereafter. She looked out her front window and saw a white man walking toward the end of her driveway. He then walked to the nearby street corner, where her neighbor had piled up a number of black garbage bags. The man was not the Defendant. A few days later, she noticed the police investigating the street corner.

Nathaniel Cochran testified that, at the time of trial, he worked as a chauffeur for the Defendant's brother, who owned a restaurant and body shop in Las Vegas, Nevada. In October 2004, however, he lived with the Defendant in the Village Apartments in Memphis. Mr. Cochran recalled that the victim stopped by his and the Defendant's apartment one day that month in order to drop off three black garbage bags full of the Defendant's clothes. The Defendant only took two of the bags, however; he placed the third one back in the victim's vehicle after retrieving a few items from it. Mr. Cochran did not witness any hostility between the victim and the Defendant.

Devector Newsum testified that he lived next door to the house the victim and the Defendant had shared before their romantic relationship ended. He remembered the events of October 16, 2004, because it was his birthday. He encountered the Defendant in the neighborhood between 11:00 p.m. and midnight. The two of them walked to a birthday barbecue being thrown for Mr. Newsum. The Defendant left the barbecue between 12:30 and 1:00 a.m.

Finally, the Defendant called MPD Sergeant Connie Justice, who said that Daniel Moore had told her he had given the victim $6,000 "in regards to buying a house," but had not been more specific.

The Defendant was convicted of one count of second degree murder and one count of theft of property valued at greater than $10,000 but less than $60,000. He now appeals.

## Analysis

### I. Exclusion of Orders of Protection

Before trial, the State learned that the Defendant intended to introduce evidence that Daniel Moore, rather than the Defendant, may have killed the victim. Specifically, the Defendant wished to introduce evidence that Daniel Moore had threatened the victim's life in the past. The State opposed the Defendant's proposed introduction of this evidence, and requested a hearing on the issue. Prior to the presentation of proof, the trial court held a jury-out hearing in which Daniel Moore testified regarding two petitions for protective orders the victim had filed against him in June and July 2003. Mr. Moore testified that the victim had alleged in the July petition that he had threatened to kill her. Although he admitted to a previous romantic relationship with the victim, Mr. Moore denied threatening her and believed she had been pressured into filing the petitions by her boyfriend at the time, Rodney Smith. Mr. Moore and the victim went to court together to dismiss the June petition; the victim never arrived in court to move forward on the July petition. As a result, both petitions were dismissed with costs assessed against the victim. The court also heard evidence of other unstable behavior by the victim, including a suicide attempt.

Unlike some other jurisdictions, Tennessee does not have a special rule for evaluating the admissibility of evidence that another may have committed a charged crime; our supreme court has held that the Tennessee Rules of Evidence are sufficient, particularly the rules of relevance. See State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003).

Evidence is relevant if it tends "to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We will not overturn a trial court's application of these rules of relevance absent an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). A trial court abuses its discretion when it "appl[ies] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that causes an injustice to the party complaining." State v. Shirley, 6. S.W.3d 243, 247 (Tenn. 1999).

The trial court's ruling is not entirely clear, but it appears to have found that the facts underlying the victim's petitions for protective orders lacked reliability because of the victim's unstable nature. Although we conclude that the victim's claims in her petitions were

relevant under Rule 401 because they tended to establish previous "animosity between the parties that would give rise to a motive to kill the victim," Powers, 101 S.W.3d at 395, we cannot conclude that the trial court abused its discretion in its apparent decision that admission of the petitions, or of testimony about the facts underlying the petitions, would have been substantially more prejudicial than probative under Rule 403. The petitions were filed fifteen months before the victim's death; the victim chose not to proceed on either petition and actually assisted Mr. Moore in dismissing one of them; and the victim remained friends with Mr. Moore. We conclude these facts sufficiently diminish the reliability, and thus the probative value, of any testimony regarding the victim's petitions or the events underlying them.

The Defendant also contends on appeal that exclusion of this evidence violated his constitutional right to present a defense. In evaluating such claims, we consider whether "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." State v. Brown, 29 S.W.3d 427, 434 (Tenn. 2000) (citing Chambers v. Mississippi, 410 U.S. 284, 298-301 (1973)).

We cannot conclude that the evidence was critical to the defense, as it concerned events having no connection to the actual crime at issue. We have no reason to doubt the reliability of the evidence that the victim petitioned for two protective orders; as discussed above, however, we agree with the trial court that the facts underlying those petitions were not reliable. Avoidance of undue prejudice is a substantially important interest. We also note that the trial court did not foreclose the Defendant from putting on any other proof that Mr. Moore was responsible for the victim's death. The Defendant is not entitled to relief on this issue.

## II. Testimony Regarding the Defendant's Criminal History

The Defendant next contends that the trial court erred by allowing Janice Carter to testify that his fingerprints were present in a database containing the fingerprints of Shelby County arrestees. The Defendant argues that this testimony should have been excluded under Tennessee Rule of Evidence 404:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with the character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404. The other issues contemplated by Rule 404(b)(2) include "identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses." State v. Hall, 958 S.W.2d 679, 707 (Tenn. 1997).

At trial, the Defendant offered to stipulate that the police had access to his fingerprints; the State declined the stipulation, however. The record reflects that the Defendant thereafter failed to object to Ms. Carter's testimony that his fingerprints were on file because he had previously been arrested. This issue is therefore waived. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

We must also consider, however, whether the Defendant has established plain error. See Tenn. R. App. P. 52(b). Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial. Id. at 642.

We conclude that the trial record establishes that evidence of the Defendant's arrest did not establish any other material issue as required by Rule 404(b)(2). The admission of this testimony did not rise to the level of plain error, however. First, because it appears that the Defendant acquiesced in the admission of the testimony, the Defendant may have waived

this issue for tactical reasons. Second, Ms. Carter did not specify how many times the Defendant had been arrested in the past, nor did she note the offenses for which he was arrested; we cannot conclude that such testimony undermined the fundamental fairness of the Defendant's trial. We also note our previous recognition that "rarely will plain error review extend to an evidentiary issue." State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App., Nashville, Sep. 11, 2007) (citation omitted).

### III. Admission of Defendant's Death Threat

The Defendant next contends that the trial court erred in admitting Tiffiney Oliver's testimony that he threatened the victim's life after she took his car. The trial court held a pretrial Rule 404(b) hearing, requested by the State, in which Ms. Oliver testified about the conversations she overheard between the Defendant and the victim. This testimony was substantially the same as her testimony at trial. The Defendant argued during that hearing that Ms. Oliver's testimony should be excluded as hearsay or, if admitted under a hearsay exception, excluded as an inadmissible "other crime, wrong, or act" under Rule 404(b). The trial court admitted the testimony over the Defendant's hearsay objection, applying Tennessee Rule of Evidence 803(1.2), which specifies that a party's own statement offered against that party is not excluded by the hearsay rule. The trial court also admitted the testimony under Rule 404(b), finding Ms. Oliver's proof clear and convincing, and finding her testimony "highly relevant for purposes of intent, motive, identification or identity."

Our review of the record reveals that the trial court complied with Rule 404(b); when a trial court substantially complies with the requirements of Rule 404(b), we review its determination under an abuse of discretion standard. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Determinations of whether a statement is hearsay or whether evidence is relevant under Tennessee Rules of Evidence 401 and 403 lie within the sound discretion of the trial court, and we will not overturn a trial court's decisions absent an abuse of discretion. See State v. Flood, 219 S.W.3d 307, 313 (Tenn. 2007); State v. Stinnet, 958 S.W.2d 329, 331 (Tenn. 1997).

At trial, the Defendant argued that his previous threats were hearsay and that they should be excluded under Rule 404(b). His argument on appeal is not entirely clear. In his brief he appears to argue only that the statements should have been excluded by Rule 403, which states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." He did not make a Rule 403 objection at the pretrial hearing, however; this issue is therefore waived. See Tenn. R. App. P. 36(a).

His reply brief instead contends that the trial court erred in finding that his threats were relevant to issues of "intent, motive, identification or identity" under Rule 404(b)(2).

-13-

We note the Defendant's argument that he conditioned his death threat on the return of his car, saying, "If you don't get the fucking car back, I'm going to kill you." Because the victim returned his car, he argues that his threat lost its probative value as evidence. He also argues that the threat, which he made the month before the victim's death, was too remote in time to be probative.

We disagree. The Defendant's objection based on temporal remoteness goes to his threat's weight rather than its admissibility. See State v. Smith, 868 S.W.2d 561, 575 (Tenn. 1993) (citations omitted). Similarly, we conclude that, although the threat's conditional nature may have diminished its probative value upon the return of the car, it retains some tendency to show that the Defendant harbored an intent and motive to kill the victim. We therefore conclude that the trial court did not abuse its discretion in admitting this evidence. This issue is without merit.

## IV. Sufficiency of the Evidence

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

**A. Second Degree Murder**

Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). The Defendant challenges the sufficiency of the evidence establishing his identity as the victim's killer. We preliminarily note our agreement with the Defendant that such evidence was wholly circumstantial; as such, proof beyond a reasonable doubt requires facts "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985) (quoting State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971). Proof must also be "inconsistent with [a defendant's] innocence and must exclude every other reasonable theory or hypothesis except that of guilt . . . ." State v. Pruitt, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). The Defendant does not dispute that the victim was killed or that the facts show that her killer acted knowingly. He does dispute, however, that the State proved his identity as the killer.

The Defendant correctly notes that no eyewitness or DNA evidence connected him to the crime. His palm print, however, was found on a bag containing a number of articles of his clothing, various personal items, and a towel covered in the victim's blood. The bag had been placed on a pile of similar bags in an apparent attempt at concealment and disposal of evidence. One latex glove was found in the bag, while another was found at the bottom of a nearby garbage can, supporting a possible inference that the Defendant left his palm print on the bag after removing one latex glove. The Defendant's previous threat to kill the victim showed some evidence of a motive.

We also note that "[a] defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt." State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985) (citing Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972)). The Defendant did not come into police custody until about two weeks after his January indictment, or about three months after the victim was killed. Sergeant Helldorfer testified that the Defendant claimed to have been hiding from the "real" killer. The jury was not required to credit this claim. The Defendant failed even to contact his family for some time after the murder, allowing them to believe that he may have been a victim as well. A rational jury could conclude that this absence evidenced more than merely an intent to hide from the "real" killer.

We conclude that this evidence is consistent with the Defendant's guilt. We also conclude that the evidence is inconsistent with the Defendant's innocence and with his apparent theory that Daniel Moore killed the victim and attempted to frame him. Testimony established that Mr. Moore and the victim were friends. Further, the jury was entitled to

-15-

reject the Defendant's implication that Mr. Moore's monetary gifts to the victim constituted a motive to kill her.

We acknowledge that the State's proof in this case was not overwhelming, but conclude that it was sufficient to allow any rational trier of fact to find that the Defendant knowingly killed the victim beyond a reasonable doubt.

### B. Theft

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. We have concluded that the evidence was sufficient to prove that the Defendant killed the victim; for the same reasons, it was also sufficient to prove that he stole her vehicle. The Defendant additionally contends, however, that the State put on insufficient proof at trial to establish the value of the victim's car. "Value" is defined as "(i) The fair market value of the property or service at the time and place of the offense; or (ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." Tenn. Code Ann. § 39-11-106(a)(36)(A). The fair market value of property is to be determined by the jury. See State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981).

We agree with the Defendant that the State did not prove the vehicle's value beyond a reasonable doubt. The State presented proof that the victim, at the time of her death, owned a 2002 Ford Escape that she had purchased new. The car was operational. The State also introduced a number of pictures of the car taken after it was recovered by police; after reviewing these pictures, we conclude they support an inference that the car was in relatively good condition. The State did not, however, put on any proof of the vehicle's monetary value. We conclude that the evidence was sufficient only to prove beyond a reasonable doubt that the vehicle had some value; we accordingly modify the Defendant's conviction for theft of property valued at greater than $10,000 but less than $60,000 to a conviction for theft of property valued at less than $500, a Class A misdemeanor. See Tenn. Code Ann. § 39-14-105(1).

## V. Sentencing

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b);

State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

The presentence report in this case indicates that, at the time of sentencing, the Defendant was forty-three years old. He dropped out of high school after the eleventh grade. He reported some employment history from 2000 to 2003. His criminal record included only a 1986 arrest for credit card fraud, for which he was not prosecuted.

### A. Consecutive Sentencing

The trial court ordered the Defendant to serve his sentences consecutively. Tennessee Code Annotated section 40-35-115(b) lists the criteria a court must use to determine whether a defendant convicted of more than one criminal offense will serve the resulting sentences consecutively or concurrently. The trial court in this case ordered the Defendant to serve his sentences consecutively based largely on its finding that the Defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Although the decision between consecutive and concurrent sentencing lies within the sound discretion of the trial court, see State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984), "the imposition of consecutive sentences on an offender found to be a dangerous

offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The Defendant takes issue with the trial court's additional consideration of the fact that the he seemed not to show remorse for his crime. The record, however, supports the trial court's finding that the Defendant is a dangerous offender, and demonstrates that it properly considered the required Wilkerson factors. This issue is without merit.

### B. Length of Sentence
As a Range I, Standard offender, the Defendant was subject to sentencing ranges of fifteen to twenty-five years for his Class A felony second degree murder conviction, and three to six years for his Class C felony theft conviction. The trial court ordered the Defendant to serve the maximum sentence on both counts, and ordered that he serve those sentences consecutively, for a total effective sentence of thirty-one years in the Department of Correction.

The Tennessee legislature recently amended several provisions of the Criminal Sentencing Reform Act of 1989, those changes becoming effective June 7, 2005. The Defendant's crimes occurred prior to that date, and he was sentenced after it. As such, the Defendant could have elected to be sentenced under the revised Act by executing a waiver of his ex post facto protections. See Tenn. Pub. Acts ch. 353, § 18. He did not execute such a waiver, however, and thus should have been sentenced under the 2003 codification of the Act. That codification violated the United States Supreme Court's requirement that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely v. Washington, 542 U.S. 296, 305-306 (2004).

The sentencing law under which the Defendant's conviction fell contained a presumptive sentence. "The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction and/or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant." State v. Phillip Blackburn, No. W2007-00061-CCA-R3-CD, 2008 WL 2368909, at *14 (Tenn. Crim. App., Jackson, Jun. 10, 2008). In this case, the trial court increased the Defendant's sentence based on two enhancement factors. First, it found that the Defendant had a previous history of criminal behavior in addition to that necessary to establish his

range.  See Tenn. Code Ann. § 40-35-114(1).  It based this factor on its finding that an ex-wife of the Defendant had filed two domestic violence complaints against him in 2001.  Second, the trial court found that the Defendant employed a deadly weapon in the commission of the offense.  See Tenn. Code Ann. § 40-35-114(9).  The trial court did not specify the relative weight it put on each factor, noting only that "both have more significance in this case because of the facts of the case than they may have in other cases."

The Defendant had no prior criminal convictions.  The trial court erred in enhancing the Defendant's sentence based on his ex-wife's domestic violence complaints because they were not admitted by the Defendant or reflected in the jury's verdict.  See Apprendi, 530 U.S. at 490; Blackburn, 2008 WL 2368909, at *14.  Testimony at trial established without question that the victim was killed by stab wounds; we therefore conclude that the use of a deadly weapon was reflected in the jury's verdict and properly considered as an enhancement by the trial court.  Because one of the two enhancement factors was applied in error, however, we remand for resentencing in accordance with Blakely and Apprendi.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's second degree murder conviction, but modify his conviction for theft of property valued at greater than $10,000 but less than $60,000 to a conviction for theft of property valued at less than $500.  The Defendant's sentence of twenty-five years for second degree murder is vacated.  This case is remanded to the trial court for resentencing consistent with this opinion.

_____
DAVID H. WELLES, JUDGE